IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EFG Bank AG, Cayman Branch, et al., | |
| Plaintiffs, | |
| v. | Case No. 2:17-cv-02592-GJP |
| The Lincoln National Life Insurance Company, | |
| Defendant. | |

**THIRD AMENDED COMPLAINT**

Plaintiffs EFG Bank AG, Cayman Branch ("EFG") and Wells Fargo Bank, National Association ("Wells Fargo"), as securities intermediary for EFG (EFG and Wells Fargo together, "EFG Plaintiffs"), and Plaintiffs DLP Master Trust, DLP Master Trust II, DLP Master Trust III, GWG DLP Master Trust, Greenwich Settlements Master Trust, and Palm Beach Settlement Company (collectively, "EAA Plaintiffs," and together with EFG Plaintiffs, "Plaintiffs"), by and through their attorneys, file this Third Amended Complaint against Defendant The Lincoln National Life Insurance Company ("Lincoln" or "Defendant"), and allege as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) and (3) because (a) the action involves plaintiffs who are citizens of South Dakota, Delaware, Germany, and Switzerland (as described fully below), and a defendant that is a citizen of the State of Indiana; and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      This Court has personal jurisdiction over Lincoln because, upon information and belief, Lincoln's principal place of business is in Radnor, Pennsylvania and Lincoln regularly conducts and transacts business in Pennsylvania.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(a)(1)  because, upon information and belief, Lincoln resides in the Eastern District of Pennsylvania.

## NATURE OF THE ACTION

4.      Plaintiffs bring this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on Lincoln's unlawful increasing of the cost of insurance (sometimes referred to herein as "COI") rates on certain of its in-force JPF Legend 300 and 400 universal life insurance policies (the "Policies").  The Policies were originally issued by Jefferson-Pilot Life Insurance Company ("Jefferson-Pilot"), which according to Lincoln, was later acquired by Lincoln.  By raising cost of insurance rates, in one case by as much as 190%, without a proper basis, Lincoln has breached the express and implied terms of the Policies.

5.      The Policies are universal life insurance policies.  Universal life insurance is a form of life insurance also known as "flexible premium" adjustable life insurance.  Universal life

insurance consists of two distinct components: (1) the life insurance component, for which the insurance company charges a cost to cover the risk of the insured's death (the "cost of insurance"); and (2) a savings component, where premiums paid in excess of the cost of insurance (and certain other policy charges) accumulate and earn interest at a rate that will not be lower than a minimum "guaranteed interest rate" (generally referred to in the life insurance industry as the "guaranteed minimum crediting rate" because the interest is "credited" to the policyholder's account).

6.      Universal life insurance is designed to give policyholders flexibility, particularly with respect to the payment of premiums.  This can be demonstrated by comparing universal life insurance to whole life insurance.  With whole life insurance, a policyholder pays fixed monthly premium payments for the life of a policy.  These fixed monthly premium payments include an amount associated with the cost of actual insurance (*i.e.*, the cost for the insurance company to bear the risk of the insured's death) but also an additional amount intended to build up a "cash value" that earns interest over time.  In the insured's earlier years, the fixed monthly premium payments are typically far higher than the insured's actual risk of death, and most of the premiums are used to accumulate cash value that will be used to fund the death benefit in the later years of the insured's life, when the fixed monthly premiums are likely to be lower than the actual risk of death.  That is, the "cash value" build-up in the earlier years operates as a "reserve" to pay the death benefit in the later years.

7.      Universal life insurance "unbundles" these two components of a whole life insurance policy and allows policyholders to choose whether to pay just enough premiums to cover the risk of death (*i.e.*, pay solely for the life insurance) or pay more (subject to certain limitations) and build up a cash value that earns tax-deferred interest (which, among other things, can be used to pay for the cost of insurance in the future).

8.      Although there is no fixed monthly premium payment that is due, if the balance in the policy account is insufficient to cover the policy's monthly charges, which includes the cost of the insurance and certain other policy charges, the policy will enter a grace period and lapse

unless additional premiums are paid.

9.      Universal life insurance policies have both guaranteed and non-guaranteed elements.  Guaranteed elements are fixed and determined at a specific time, such as when the policy was issued.  Non-guaranteed elements, on the other hand, are not fixed at a specific time and can be adjusted by the life insurance company under the terms of the policy.  An example of a guaranteed element is the guaranteed minimum interest (or crediting) rate.  An example of a non-guaranteed element is the cost of insurance rate.

10.      Although the Policies permit Lincoln to adjust the cost of insurance rates (by increasing or decreasing them), the Policies restrict Lincoln's ability to do so in at least two important ways.  First, Lincoln may only change cost of insurance rates based on "future mortality, interest, expenses, and lapses."  Second, any change in cost of insurance rates must be "on a uniform basis for Insureds of the same rate class."

11.      The most important assumption in life insurance is mortality, and it is well-known in the life insurance industry that since Jefferson-Pilot began issuing the Policies in approximately 1999, mortality has *improved*, not *worsened*.  Indeed, in 2015, just one year before Lincoln began raising cost of insurance rates, the National Center for Health Statistics reported that mortality had improved by 16.6% between 2000 and 2014.[1]  This improvement in mortality has resulted in new life insurance mortality tables that would, if anything, support a *decrease*, not *increase*, in cost of insurance rates.  Despite this, Lincoln has increased the cost of insurance rates on the Policies, and it has done so by as much as 190%, in blatant breach of the Policies' express and implied terms and conditions.

12.      Lincoln also has attempted to justify its rate increase by claiming that low interest rates have resulted in lower than expected investment income to Lincoln.  But lower interest rates should not justify a rate increase in the range of 40% to 190%.

13.      Furthermore, as noted above, the Policies state that any change in cost of insurance rates "will be on a uniform basis for Insureds of the same rate class."  But Lincoln

---

[1] Sherry L. Murphy, et al., *Mortality in the United States*, 2014, NCHS Data Brief No. 229, 5 (Dec. 2015).

admits that its rate increase does not apply on a uniform basis for insureds of the same rate class; it applies differently to insureds in the same rate class based on when their Policies were issued (*i.e.*, based on duration).

14.    Moreover, by drastically raising cost of insurance rates by as much as 190%, it is apparent that Lincoln seeks to force Plaintiffs and other policyholders either to (a) pay exorbitant premiums that Lincoln knows would no longer justify the ultimate death benefits, or (b) lapse or surrender their Policies and forfeit the premiums they have paid to date, thereby depriving policyholders of the benefits of their Policies.  Lincoln, in turn, will make a huge profit—either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the vast majority of the premiums that have been paid to date on them.

15.    To better understand the basis for Lincoln's sudden and massive rate increase, counsel, on behalf of EAA Plaintiffs, have attempted to obtain the information that Lincoln relied on to justify its rate increase, including Lincoln's original mortality and interest expectations and evidence of its alleged adverse mortality and interest experience, but Lincoln has failed and refused to provide this information.

16.    Lincoln's misconduct, as described more fully herein, constitutes not only express breaches of the Policies, but also breaches of the implied covenant of good faith and fair dealing. Plaintiffs therefore seek compensatory and punitive damages, as well as equitable relief and attorneys' fees.

17.    Indeed, in apparent response to complaints about a similar rate increase imposed by another life insurance company, the New York State Department of Financial Services ("NYDFS") recently proposed a new regulation to protect policyholders "from unjustified life insurance premium increases."[2]  The regulation would give NYDFS the opportunity to review potential rate increases by requiring life insurance companies to notify NYDFS "at least 120 days prior to an adverse change in non-guaranteed elements of an in-force life insurance or

---

[2] *See* Press Release, NYDFS, *DFS Proposes New Regulation to Protect New Yorkers from Unjustified Life Insurance Premium Increases* (Nov. 17, 2016), http://www.dfs.ny.gov/about/press/pr1611171.htm.

annuity policy."[3]  The regulation also would require insurers to notify policyholders "at least 60 days prior to an adverse change in non-guaranteed elements of an in-force life insurance or annuity policy."[4]  In addition, the regulation would require insurers to "establish board-approved criteria for determining non-guaranteed charges or benefits" and would mandate a NYDFS review of "the anticipated experience factors and non-guaranteed elements for existing policies whenever the non-guaranteed elements on newly issued policies are changed."[5]  The regulation defines experience factors as "investment income, mortality, morbidity, persistency, or expense that represents the insurer's financial experience on a policy."[6]  "Profit margin is not an experience factor."[7]

18.     In announcing the proposed regulation in a press release dated November 17, 2016, NYDFS Superintendent Maria Vullo declared that New York "will not stand by and provide life insurers free reign to implement unjustified cost of insurance increases on New Yorkers simply to boost profits."[8]

19.     An article in *The Wall Street Journal* published the same day notes that although the regulation would apply only in New York, it "could be widely copied by other insurance departments."[9]

## THE PARTIES

20.     Plaintiff Wells Fargo is a national banking association with its principal place of business in Sioux Falls, South Dakota.  Plaintiff EFG Bank AG, Cayman Branch is a Swiss banking corporation with its principal place of business in Switzerland; Cayman Branch refers to a branch office in the Cayman Islands.  EFG is the ultimate owner and beneficiary of certain of the life insurance policies at issue in this case, which EFG either holds in a security account

---

[3] *Id.*
[4] *Id.*
[5] Life Insurance & Annuity Non-Guaranteed Elements §48.2, 11 NYCRR 48 (proposed Nov. 17, 2016), http://www.dfs.ny.gov/insurance/r_prop/rp210txt.pdf.
[6] *Id.*
[7] *Id.*
[8] Press Release, NYDFS, *supra* note 2.
[9] Leslie Scism, *New York Regulator Aims to Require Life Insurers Justify Higher Rates on Old Policies*, Wall St. J. (Nov. 17, 2016), http://www.wsj.com/articles/new-york-regulator-aims-to-require-life-insurers-justify-higher-rates-on-old-policies-1479394201.

maintained by Wells Fargo, as securities intermediary for EFG pursuant to a Securities Account Control Agreement, dated as of November 7, 2007, between EFG Bank AG, Guernsey Branch and Wells Fargo, as modified by that certain Assignment and Amendment Agreement dated as of June, 2010, by and among EFG, EFG Bank AG, Guernsey Branch, and Wells Fargo (as modified, the "2007 SACA") or held in a security account maintained by Wells Fargo, as securities intermediary, pursuant to a Securities Account Control Agreement, dated as of November 7, 2008, by and among EFG Bank AG, Guernsey Branch, Credit Suisse Securities (Europe) Limited, and Wells Fargo, as terminated by a SACA Termination and Release, dated as of December 21, 2017, by and among EFG acting through its Cayman Islands Branch, Credit Suisse Securities (Europe) Limited, and Wells Fargo (the "2008 SACA," and together with the 2007 SACA, the "SACA Agreements").[10]  Under the SACA Agreements, each life insurance policy at issue constitutes a "Financial Asset" that Wells Fargo, as securities intermediary, has credited to the securities account.  EFG is the "entitlement holder" and is entitled to exercise the rights that comprise each Financial Asset credited to the securities account.  EFG owns the ultimate financial interests in the policies.  Wells Fargo, as securities intermediary for EFG, is identified as the owner and beneficiary on the records of the insurance company.

21.     Plaintiff DLP Master Trust is a Delaware statutory trust.  The trustee of DLP Master Trust is Wells Fargo.  The Delaware trustee of DLP Master Trust is Wells Fargo Delaware Trust Company, National Association ("Wells Fargo Delaware Trust Company"), a national banking association.  The certificate holder of DLP Master Trust is EAA DLP I LLP. EAA DLP I LLP is a Delaware limited liability partnership.  The partners of EAA DLP I LLP are Erste EAA Anstalt öffentlichen Rechts & Co. KG ("EAA Anstalt") and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.  EAA Anstalt is analogous to a limited partnership under the laws of Germany whose members are Erste Abwicklungsanstalt Anstalt des öffentlichen Rechts ("EAA") as

---

[10] Here, as securities intermediary, Wells Fargo is "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity."  U.C.C. § 8-102(a)(14)(ii).

general partner and Sechste EAA-Beteiligungs GmbH as a limited partner.  Sechste EAA-Beteiligungs GmbH is a wholly-owned subsidiary of EAA.  EAA is a public agency and is regarded as a juridical person under the laws of Germany.

22.     Plaintiff DLP Master Trust II is a Delaware statutory trust.  The trustee of DLP Master Trust II is Wells Fargo.  The Delaware trustee of DLP Master Trust II is Wells Fargo Delaware Trust Company.  The certificate holder of DLP Master Trust II is EAA DLP II LLP.  EAA DLP II LLP is a Delaware limited liability partnership.  The partners of EAA DLP II LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.  EAA Anstalt is analogous to a limited partnership under the laws of Germany whose members are EAA as general partner and Sechste EAA-Beteiligungs GmbH as a limited partner.  Sechste EAA-Beteiligungs GmbH is a wholly-owned subsidiary of EAA.  EAA is a public agency and is regarded as a juridical person under the laws of Germany.

23.     Plaintiff DLP Master Trust III is a Delaware statutory trust.  The trustee of DLP Master Trust III is Wells Fargo.  The Delaware trustee is Wells Fargo Delaware Trust Company.  The certificate holder of DLP Master Trust III is EAA DLP III LLP.  EAA DLP III LLP is a Delaware limited liability partnership.  The partners of EAA DLP III LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.  EAA Anstalt is analogous to a limited partnership under the laws of Germany whose members are EAA as general partner and Sechste EAA-Beteiligungs GmbH as a limited partner.  Sechste EAA-Beteiligungs GmbH is a wholly-owned subsidiary of EAA.  EAA is a public agency and is regarded as a juridical person under the laws of Germany.

24.     Plaintiff GWG DLP Master Trust is a Delaware statutory trust.  The trustee of GWG DLP Master Trust is Wells Fargo.  The Delaware trustee of GWG DLP Master Trust is Wells Fargo Delaware Trust Company.  The certificate holder of GWG DLP Master Trust is EAA LAT II LLP.  EAA LAT II LLP is a Delaware limited liability partnership.  The partners of EAA LAT II LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a

Delaware limited liability company whose sole member is EAA Anstalt.  EAA Anstalt is analogous to a limited partnership under the laws of Germany whose members are EAA as general partner and Sechste EAA-Beteiligungs GmbH as a limited partner.  Sechste EAA-Beteiligungs GmbH is a wholly-owned subsidiary of EAA.  EAA is a public agency and is regarded as a juridical person under the laws of Germany.

25.     Plaintiff Greenwich Settlements Master Trust is a Delaware statutory trust.  The trustee of Greenwich Settlements Master Trust is Wells Fargo.  The Delaware trustee of Greenwich Settlements Master Trust is Wells Fargo Delaware Trust Company.  The certificate holder of Greenwich Settlements Master Trust is EAA Greenwich LLP.  EAA Greenwich LLP is a Delaware limited liability partnership.  The partners of EAA Greenwich LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.  EAA Anstalt is analogous to a limited partnership under the laws of Germany whose members are EAA as general partner and Sechste EAA-Beteiligungs GmbH as a limited partner.  Sechste EAA-Beteiligungs GmbH is a wholly-owned subsidiary of EAA.  EAA is a public agency and is regarded as a juridical person under the laws of Germany.

26.     Plaintiff Palm Beach Settlement Company is a Delaware statutory trust.  The trustee of Palm Beach Settlement Company is Wells Fargo.  The Delaware trustee of Palm Beach Settlement Company is Wells Fargo Delaware Trust Company.  The certificate holder of Palm Beach Settlement Company is EAA Triskele LLP.  EAA Triskele LLP is a Delaware limited liability partnership.  The partners of EAA Triskele LLP are EAA Anstalt and LS EAA Holdings, LLC.  LS EAA Holdings, LLC is a Delaware limited liability company whose sole member is EAA Anstalt.  EAA Anstalt is analogous to a limited partnership under the laws of Germany whose members are EAA as general partner and Sechste EAA-Beteiligungs GmbH as a limited partner.  Sechste EAA-Beteiligungs GmbH is a wholly-owned subsidiary of EAA. EAA is a public agency and is regarded as a juridical person under the laws of Germany.

27.     Upon information and belief, Defendant Lincoln is an Indiana corporation with its principal place of business in Radnor, Pennsylvania.

## FACTUAL BACKGROUND

### A.   Plaintiffs Are Owners of Universal Life Insurance Policies Subject to Lincoln's COI Increase

28.     EFG is the ultimate owner and beneficiary of 29 Policies that Jefferson-Pilot issued between 2004 and 2005 (and that Lincoln later acquired) and that are subject to the cost of insurance rate increase (the "EFG Policies").  The EFG Policies range in face amount from $2.5 million to $12.5 million and are listed on the attached **Exhibit 1**.  The EFG Policies include Policies issued and delivered in the States of California and Georgia.  A sample of one of EFG's policies, redacted for privacy, is attached hereto as **Exhibit 2** ("EFG Doe Policy").  As noted above, Wells Fargo is listed on Lincoln's records as the owner and beneficiary of the EFG Policies, but solely as securities intermediary for EFG.  EFG, as the entitlement holder, owns the ultimate financial interest in the EFG Policies.  With respect to one of the EFG Policies (Policy Number JF5515522), on or about May 14, 2018, EFG was expressly assigned all rights in the policy in connection with its foreclosure of this policy, which assignment included all rights of recourse or recovery against Lincoln relating to its cost of insurance rate increase.

29.     EAA Plaintiffs are the owners and beneficiaries of 26 Policies that Jefferson-Pilot issued between 2003 and 2005 (and Lincoln later acquired) and that are subject to the cost of insurance rate increase (the "EAA Policies," and together with the EFG Policies, the "Plaintiff Policies").  The EAA Policies range in face amount from $450,000 to $10 million and are listed on the attached **Exhibit 3**.  The EAA Policies include Policies issued and delivered in the States of Arizona, California, Florida, Illinois, Massachusetts, North Carolina, and New Jersey.  A sample of one of the EAA Policies, redacted for privacy, is attached hereto as **Exhibit 4** ("EAA Doe Policy," and together with the EFG Doe Policy, the "Doe Policies").

30.     As is typical of universal life insurance policies, the Plaintiff Policies provide that they will remain in force as long as there are sufficient funds in the policy account each month to cover the monthly policy charges.  The monthly charges include a premium charge, an administrative charge, and a cost of insurance charge, plus charges for any policy riders.  Any

balance in the policy account that is left after the deductions are taken reflects the "Policy Value," which accrues interest at a rate that cannot be lower than the "guaranteed interest rate." EFG Doe Policy, Ex. 2, at 4, 8; EAA Doe Policy, Ex. 4, at 4, 8.  If in any month there are insufficient funds in the account to cover the monthly policy charges, the policy will enter a 60-day grace period.  If additional premiums are not paid within the grace period, Lincoln will terminate, or lapse, the policy.  EFG Doe Policy, Ex. 2, at 7; EAA Doe Policy, Ex. 4, at 7.

31.     The largest and most significant charge under the Plaintiff Policies is the cost of insurance charge.  This charge, also known as the mortality charge, reflects the price that Lincoln charges to cover the risk of the insured's death.  The cost of insurance charge is determined by multiplying the cost of insurance rate times the net amount at risk.  The net amount at risk is the death benefit minus the Policy Value.  The Policy Value, as described above, is deducted from the death benefit because, although the Policy Value is part of the death benefit paid upon the insured's death, policyholders do not pay cost of insurance on the Policy Value, which is the savings component of the Plaintiff Policies and not the "insurance."

32.     The cost of insurance rates under a policy are based initially on certain characteristics of the insured, including her or his gender, age, and underwriting class (*i.e.*, preferred plus, preferred, standard, and substandard classes).  The cost of insurance rate increases every year as the insured ages.

33.     The Plaintiff Policies state that "the monthly cost of insurance rates are determined by [Lincoln]."  EFG Doe Policy, Ex. 2, at 8; EAA Doe Policy, Ex. 4, at 8.  Specifically, the "Cost of Insurance Rates" provision provides:

> The monthly cost of insurance rates are determined by [Lincoln]. Rates will be based on our expectation of future mortality, interest, expenses, and lapses.  Any change in the monthly cost of insurance rates used will be on a uniform basis for Insureds of the same rate class.

EFG Doe Policy, Ex. 2, at 8; EAA Doe Policy, Ex. 4, at 8.

34.     Accordingly, among many other things, under the terms of the Plaintiff Policies, any change in the COI rates: (a) can only be "based on [Lincoln's] expectation of future mortality, interest, expenses, and lapses"; and (b) must be "on a uniform basis for Insureds of the same rate class."

**B.      Lincoln Raises Cost of Insurance Rates**

35.     In September 2016, Lincoln began notifying the policyholders that it was raising the cost of insurance rates on certain of its in-force universal life insurance policies.  Sample notice letters for the EFG Doe Policy and the EAA Doe Policy are attached hereto as **Exhibit 5** and **Exhibit 6**, respectively ("Notice Letters").  The Notice Letters state that "your policy's cost of insurance (COI) rates will increase."  Exs. 5 and 6.  Lincoln further states that an adjustment to the COI rates is necessary because "[w]e are operating in a challenging and changing environment as we continue to face nearly a decade of persistently low interest rates, including recent historic lows, and volatile financial markets."  *Id.*  As a result, Lincoln states that it is "making fair and reasonable adjustments as necessary and appropriate to ensure we are providing value to our customers while operating responsibly for the long-term."  *Id.*

36.     Lincoln does not state in the letters how much the rate increase will be, instead stating that the "amount of the COI rate change depends upon the product, underwriting class and duration."  *Id.* at FAQ No. 3.  The range of the increase has since been calculated to generally be between 60% and 70%, with some 40% increases and one as high as 190%.

37.     With the Notice Letters, Lincoln attached a "Frequently Asked Questions" section ("FAQs").  In the FAQs, Lincoln responds to the frequently asked question why COI rates are changing.  Lincoln's response states: "Cost of insurance (COI) rates are based on certain cost factors, including mortality, interest, expenses and lapses.  Our future expectations for these cost factors have changed; therefore policy COI rates have been adjusted to appropriately reflect those future expectations."  *Id.* at FAQ No. 1.

38.     Responding to a question whether COI rates were going up for all policies, Lincoln responded as follows:  "All policyholders holding the impacted products will have some

form of COI adjustment.  While the majority of the rate changes are increases, some adjustments will be decreases, depending on future expectations of policy cost factors."  *Id.* at FAQ No. 2.

39.     In addition, in statements made to agents and brokers concerning the COI increase, which counsel for Plaintiffs found on the Internet, Lincoln stated that the rate increase was based on "material changes in future expectations of key cost factors associated with providing this coverage, including: [l]ower investment income as a result of continued low interest rates[;] [u]pdated mortality assumptions, including instances of both higher and lower expected mortality rates versus prior expectations[; and] [u]pdated expenses, including higher reinsurance rates."  Abbreviated Preview Edition of the Upcoming August 29, 2016, Lincoln Leader, Lincoln Financial Group, available at http://lincolnfinancial.dmplocal.com/dsc/collateral/LincolnLifeLeader-LGULCOI_-_No_watermark.pdf (last visited Jan. 7, 2017) (discussion of the Policies at issue in this case on page 4).

40.     On November 18, 2016, counsel on behalf of EAA Plaintiffs sent letters to Lincoln requesting additional information about the bases for Lincoln's rate increase.  On January 4, 2017, counsel for EAA Plaintiffs received a response letter from Lincoln that failed to respond to any of the questions that counsel, on behalf of EAA Plaintiffs, asked.  A true and correct copy of Lincoln's January 4, 2017 letter is attached hereto as **Exhibit 7**.  For example, counsel, on behalf of EAA Plaintiffs, asked Lincoln to identify which of Lincoln's future cost factors have changed.  Lincoln responded by stating, "The policies' costs of insurance rates are based on certain cost factors including mortality, interest, expenses, and lapses.  Lincoln's future expectations for these cost factors have changed."  Ex. 7 at 1.  Counsel, on behalf of EAA Plaintiffs, also asked how the duration of a policy impacts the COI rate and the amount of the rate increase.  Lincoln responded, "The amount of the COI rate change depends upon duration, as well as the product and underwriting class."

41.     In light of Lincoln's failure to respond to counsel's, on behalf of EAA Plaintiffs, questions, on January 9, 2017, counsel on behalf of EAA Plaintiffs sent another letter to Lincoln

asking Lincoln to answer the questions it failed to answer.  No response has been received as of the date of this filing.

42.     In addition, in November 2016, counsel, on behalf of EAA Plaintiffs, made public records requests to the California Department of Insurance requesting documents relating to Lincoln's rate increase, but the Department of Insurance responded that it did not have any responsive documents.

43.     Because it appears that no one but Lincoln has information about the basis for its rate increase, Lincoln's refusal to provide the information has prevented policyholders like Plaintiffs from verifying the accuracy of Lincoln's representations that the rate increase is justified by changes in its expectations as to "mortality, interest, expenses, and lapses."  It is likely for this very reason that NYDFS proposed its new regulation, which would require life insurance companies like Lincoln to notify NYDFS and policyholders in advance of any adverse change in the non-guaranteed elements of an in-force life insurance policy and would mandate regulatory review of the anticipated experience factors, such as mortality, interest, and expenses.

44.     Regardless, it is apparent that Lincoln's rate increase breaches the terms of the Plaintiff Policies in at least four ways.  *First*, the rate increase is not "on a uniform basis for Insureds of the same rate class."  *Second*, the rate increase is not "based on [Lincoln's] expectation of future mortality, interest, expenses, and lapses."  *Third*, Plaintiffs are informed and believe, and on that basis allege, that the rate increase impermissibly attempts to circumvent the guaranteed interest rate under the Plaintiff Policies.  *Fourth*, the rate increase breaches the implied covenant of good faith and fair dealing that exists in every insurance contract.

**C.     The Rate Increase Is Not Uniform for All Policyholders in a Class**

45.     Lincoln's rate increase violates the provision that any rate increase be "on a uniform basis for Insureds of the same rate class" because the rate increase is not uniform for insureds of the same rate class.  As Lincoln admits in the FAQ and in its letters to counsel for EAA Plaintiffs, the amount of the COI rate increase depends not just on the insured's rate class but also on "duration."  Exs. 5 and 6, at FAQ No. 3.  By basing the rate increase on more than

just the insured's rate class, the rate increase is not "on a uniform basis for Insureds of the same rate class."

      **D.**      **The Rate Increase Is Not Justified by Changes in Expectations as to Mortality and Interest**

46.     The Plaintiff Policies state that Lincoln may base a change in cost of insurance rates only on "[Lincoln's] expectation of future mortality, interest, expenses, and lapses."  These are the only four factors that Lincoln may consider.  Furthermore, to be in good faith and based on "future" expectations, the change in the cost of insurance rates must correspond with the magnitude of the changes in Lincoln's future expectations.

47.     Based on Lincoln's various statements about its rate increase, it appears that Lincoln has raised COI rates due primarily to purported changes in its expectations as to mortality and interest.

      **Mortality**

48.     ***First***, as to mortality, it is well known in the life insurance industry that over the past decade, mortality has improved, not worsened, and people are living much longer than anticipated when Jefferson-Pilot originally priced the Plaintiff Policies in or around 1999.  For example, in 2015, just one year before Lincoln's rate increase, the National Center for Health Statistics reported "[s]ignificant decreases in mortality in 2014 compared with 2013" and observed that this year-to-year improvement was "consistent with long-term trends."   "Although year-to-year changes are usually relatively small," explained the National Center for Health Statistics, "the age-adjusted death rate in the United States decreased 16.6% between 2000 (869.0) and 2014 (724.6)."   This "long-term trend" of improving mortality is also evidenced by the release of several new mortality tables over the past two decades that would, if anything, support a decrease in cost of insurance rates, not increases as high as 190%.

49.     Specifically, in 2001, the Society of Actuaries ("SOA") and the American Academy of Actuaries ("AAA") produced the 2001 Commissioner's Standard Ordinary ("CSO") Table, which replaced the previous 1980 CSO Table to reflect significant improving mortality,

especially at older ages.  The maximum cost of insurance rates allowed under the Plaintiff Policies, however, are based on the older 1980 CSO Table, not the newer 2001 CSO Table.   The SOA also is currently investigating an update of the 2001 CSO Table, and a 2015 investigative report by the SOA showed significant reductions in insurance company reserves compared to the 2001 CSO Table due to mortality improvements since 2001.  In addition, in 2008, the SOA released a 2008 Valuation Basic Table ("VBT") that reflected significant mortality improvements compared to prior tables, especially at older ages.  In 2014, the SOA released the 2014 VBT, which showed overall mortality improvement from the 2008 VBT.

50.     These new mortality tables demonstrate that since 1999 when the Plaintiff Policies were originally priced, mortality has improved, not worsened, and this change in mortality would support a *decrease*, not increase, in cost of insurance rates.

**Interest**

51.     *Second*, as to interest, according to Lincoln's statements to its brokers and agents, Lincoln has raised COI rates in part due to lower interest rates, which Lincoln claims have resulted in lower investment income to Lincoln.

52.     While "interest" is listed as a cost factor upon which Lincoln may base a change in cost of insurance rates, Plaintiffs are informed and believe, and on that basis allege, that Lincoln's rate increase is based on "a decade of persistently low interest rates, including recent historic lows, and volatile financial markets."  The historic decline in interest rates, however, cannot be the basis for a change in cost of insurance rates because the Policies require that any change in cost of insurance rates be based on Lincoln's expectations for the future.  It cannot raise cost of insurance rates to recover past losses or shortfalls resulting from historic low interest rates.

53.     Moreover, even if lower interest rates may impact Lincoln's cost of providing insurance, they would not justify a cost of insurance rate increase as high as 40% to 190% because interest rates should be a relatively minor factor in calculating Lincoln's cost of insurance (and, consequently, its cost of insurance rates).

54. To begin with, as it relates to cost of insurance rates, "interest" (one of the cost factors Lincoln may consider) can only refer to the interest that Lincoln earns (or expects to earn) on its profits from providing insurance, and not on funds in policyholders' accounts. As explained above, universal life insurance policies, like the Policies, consist of two distinct components—(a) the life insurance, or "mortality," component; and (b) the accumulated value, or "savings," component. Lincoln earns interest from both of these components.

55. However, although a life insurance company may earn interest on both the mortality component and the savings component, it can only consider interest on the mortality component when determining *cost of insurance*. The interest it earns from investing funds in policyholder accounts (i.e., the savings component), on the other hand, is only relevant to setting the interest rate credited to those accounts, and is not relevant to determining the cost of insurance. This is because the cost of insurance is the mortality charge. It is intended to cover the risk of the insured's death, not the interest rate risk associated with policyholder accounts (and guaranteeing policyholders a minimum interest rate on their policy accounts).

56. The cost of insurance charge includes an expected profit over the insurance company's expected mortality. The insurance company then expects to invest this profit and earn interest on it. The company then factors this profit and the interest on this profit in setting the cost of insurance rates. Lower interest rates may result in lower investment income, but lower interest rates would not result in a loss unless the insurance company's investments had a negative return. But this is highly unlikely to occur because most life insurance companies invest primarily in fixed-income securities, such as bonds. Thus, to the extent Lincoln is raising cost of insurance rates because it is earning less investment income on its mortality profits as a result of low interest rates, it is highly unlikely that this lower investment income would justify a rate increase, much less one as high as 190%.

57. To illustrate this, assume Lincoln's COI rate contemplated a 20% mortality profit. For every $120 in COI charges received in a year, Lincoln would expect to pay out $100 in claims, leaving $20 in mortality profits to invest. If it assumed it would earn 5% on the profit of

$20 in that year, it would expect to earn $1.00 of investment income. If it now expects to earn 1% interest instead of 5%, the investment income would drop to $0.20 instead of $1.00. But this 80% drop in investment income would not translate to an 80% COI rate increase because it does not capture the $20 mortality profit. In other words, Lincoln is earning $20.20 instead of $21.00 on the mortality component, which is a difference of less than 4%, assuming mortality is as expected. If Lincoln experienced favorable mortality, that favorable mortality experience should also offset the cost associated with the lower than expected investment income. Although this is a very rudimentary example, it illustrates how a decline in interest rates is not likely to result in a COI rate increase in the range of 40% to 190%.

58.     As to the interest earned on the savings component of a universal life insurance policy, a life insurance company expects to earn a spread on the funds that policyholders maintain in their policy accounts. That is, if the life insurance company is earning 8% interest on policyholder accounts, it may credit policyholders 7% and earn a spread of 1%. If interest rates are low and the company is earning only 5% interest, it may lower the crediting rate to 4% and still earn a 1% spread. Thus, even if Lincoln could consider the interest it earns from investing funds in policyholders' accounts (which it cannot), this would not justify a COI rate increase, but only a change in the interest rate credited to policyholders' accounts.

59.     However, if Lincoln expects to earn only 3% interest from investing funds in policyholders' accounts, Lincoln cannot reduce the crediting rate to 2% because this would be below the guaranteed minimum interest rate credited to policyholders. Nor, however, can Lincoln attempt to offset this loss by raising COI rates. If it could, the cost of insurance would not be a mortality charge, but a way for Lincoln to guarantee its profitability on the policies by transferring to policyholders all risk under the policies, including the interest rate risk on Policy Values. This would render the guaranteed minimum interest rate meaningless.

60.     Furthermore, even if Lincoln is properly considering only interest on its mortality profits, to the extent Lincoln is raising cost of insurance rates to achieve its original profit expectations, the rate increase is improper because Lincoln cannot raise rates simply to guarantee

itself its original profit expectations.  As NYDFS has said, life insurance companies do not have free reign to raise COI rates "simply to boost profits" because profit margin is not an experience factor.

61.     In light of this, and given the magnitude of Lincoln's rate increase, Plaintiffs are informed and believe, and on that basis allege, that Lincoln has raised COI rates, not because its mortality and interest experience has been unfavorable enough to require an increase in COI rates, but solely to boost its profits.  Profit is not a factor that Lincoln can consider in changing COI rates.  Furthermore, using COI rates to guarantee Lincoln's original profitability expectations, and thereby placing its interest in maximizing gains over the rights of policyholders, would constitute a breach of the implied covenant of good faith and fair dealing.

62.     In sum, by drastically raising cost of insurance rates on the Plaintiff Policies, Lincoln seeks to force Plaintiffs to (a) pay exorbitant premiums that Lincoln knows would no longer justify the ultimate death benefits or (b) lapse or surrender their Policies, thereby forfeiting the premiums they have paid over the last several years.  Lincoln, in turn, will make a huge profit—either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the premiums that have been paid to date.

**E.      The Cost of Insurance Rate Increase Is an Impermissible Attempt to Circumvent the Guaranteed Minimum Interest Rate**

63.     Under the express terms of the Plaintiff Policies, a policyholder has the right to pay just enough premiums to cover the monthly policy charges.  If the policyholder contributes more than needed to cover the monthly charges, leaving a balance remaining in the policy account, the Plaintiff Policies provide that the balance will accrue interest at a rate no lower than the "guaranteed interest rate."  *See* EFG Doe Policy, Ex. 2, at 8; EAA Doe Policy, Ex. 4, at 8. The guaranteed interest rate provided for under the Plaintiff Policies is 4%.

64.     Lincoln suggested that low interest rates, which may have reduced Lincoln's investment income, were at least one reason for its rate increase.  To the extent Lincoln considered the interest it earns on funds in policyholder accounts, the rate increase also violates

the Plaintiff Policies' guaranteed minimum interest rate provision. This is evident because if Lincoln's investment income did not drop near or below the guaranteed interest rate, Lincoln could simply address the change in interest rates by lowering the interest rate credited to policyholders. But if Lincoln is raising cost of insurance rates instead of lowering the interest rate credited to policyholders, this presumably is because lowering the interest rate credited to policyholders would not be sufficient for Lincoln—because it is earning interest near or below the guaranteed interest rate (thus, reducing its originally anticipated spread). By raising cost of insurance rates to account for this, however, Lincoln is trying to do indirectly what it cannot do directly: it is using cost of insurance rates to achieve an interest rate credited to policy accounts that is lower than the guaranteed minimum interest rate, which violates the Plaintiff Policies.

65.     In short, Lincoln is trying to take the "guarantee" out of the guaranteed interest rate. By depriving policyholders of the right to the guaranteed interest rate, Lincoln has breached not just the express terms of the Plaintiff Policies, but also the implied covenant of good faith and fair dealing.

## COUNT I

### (Breach of Contract – Express)

### (All Policies)

66.     Plaintiffs reallege the allegations contained in paragraphs 1 through 65 inclusive, as if set forth fully herein.

67.     The Plaintiff Policies are binding and enforceable contracts.

68.     Defendant materially breached the Plaintiff Policies in several respects, including, but not limited to, the following:

        a.     By increasing the cost of insurance rates on a basis that is not uniform for insureds of the same rate class;

        b.     By increasing the cost of insurance rates on a basis other than Defendant's "expectation of future mortality, interest, expenses, and lapses;"

      c.      By increasing the cost of insurance rates in an attempt to circumvent the guaranteed minimum interest rate; and

      d.      By imposing excessive cost of insurance rates.

69.      Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

70.      As a direct and proximate cause of Defendant's material breaches of the Plaintiff Policies, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

## COUNT II

### (Implied Covenant of Good Faith and Fair Dealing – Contractual Breach)

### (Policies issued in AZ, CA, FL, GA, MA, NJ, and NC)

71.      Plaintiffs reallege the allegations contained in paragraphs 1 through 65, inclusive, as if set forth fully herein.

72.      The Plaintiff Policies are binding and enforceable contracts.

73.      The Plaintiff Policies includes an implied covenant, actionable in contract, that Defendant will act in good faith and deal fairly with Plaintiffs.

74.      Defendant materially breached the Plaintiff Policies in several respects, including, but not limited to, the following:

      a.      By charging excessive cost of insurance rates, thereby denying Plaintiffs the benefit of their actual Policy Values;

      b.      By considering interest that it earns on policyholder accounts, as opposed to interest only from its mortality profits, in raising cost of insurance rates;

      c.      By increasing cost of insurance rates in an attempt to achieve Lincoln's original expected profitability for the Plaintiff Policies at the policyholders' expense;

      d.      By increasing the cost of insurance rates to circumvent the guaranteed minimum interest rate under the Plaintiff Policies;

e.     By attempting to force Plaintiffs either to (a) pay exorbitant premiums that Lincoln knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date; and

f.     By failing to provide meaningful disclosures about the cost of insurance rate increases.

75.     Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

76.     Defendant's breaches were conscious, deliberate, and unreasonable acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiff Policies and which disappointed Plaintiffs' reasonable expectations by denying Plaintiffs the benefits of the Plaintiff Policies.

77.     As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.  Furthermore, Lincoln's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## COUNT III

### (Implied Covenant of Good Faith and Fair Dealing – Tortious Breach)

### (Policies issued in CA)

78.     Plaintiffs reallege the allegations contained in paragraphs 1 through 65, inclusive, as if set forth fully herein.

79.     The Plaintiff Policies are binding and enforceable contracts.

80.     The Plaintiff Policies include an implied covenant, actionable in tort, that Defendant will act in good faith and deal fairly with Plaintiffs.

81.     Defendant materially breached the Plaintiff Policies in several respects, including, but not limited to, the following:

a.    By charging excessive cost of insurance rates, thereby denying Plaintiffs the benefit of their actual Policy Values;

b.    By considering interest that it earns on policyholder accounts, as opposed to interest only from its mortality profits, in raising cost of insurance rates;

c.    By increasing cost of insurance rates in an attempt to achieve Lincoln's original expected profitability for the Plaintiff Policies at the policyholders' expense;

d.    By increasing the cost of insurance rates to circumvent the guaranteed minimum interest rate under the Plaintiff Policies;

e.    By attempting to force Plaintiffs either to (a) pay exorbitant premiums that Lincoln knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid to date; and

f.    By failing to provide meaningful disclosures about the cost of insurance rate increases.

82.    Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

83.    Defendant's breaches were conscious and deliberate acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiff Policies and which disappointed Plaintiffs' reasonable expectations and disregarded Plaintiffs' rights by denying Plaintiffs the benefits of the Plaintiff Policies.

84.    As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.  Furthermore, Lincoln's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

**COUNT IV**

**(Declaratory Relief)**

**(All Policies)**

85.     Plaintiffs reallege the allegations contained in paragraphs 1 through 65, inclusive, as if set forth fully herein.

86.     For reasons including, but not limited to, those stated herein, there exists an actual dispute and controversy between Plaintiffs and Defendant concerning Plaintiffs' rights and Defendant's obligations under the Plaintiff Policies, including but not limited to how Defendant must implement any change in the cost of insurance rates and under what circumstances Defendant may change the cost of insurance rates.

87.     Accordingly, Plaintiffs seek a declaration (a) that Defendant's cost of insurance rate increase is improper under the Plaintiff Policies and that the Policies' account values be recalculated according to the original cost of insurance rates; and (b) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates.

88.     Such a declaration will help prevent or limit any future controversies under the Plaintiff Policies by providing guidance as to when and how Defendant can change the cost of insurance rates on its in-force Policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

### On the First Cause of Action

1.     For compensatory damages in an amount to be determined at trial;

2.     For an award of pre-judgment and post-judgment interest;

3.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.     For such other and further relief as the Court may deem proper.

### On the Second Cause of Action

1.     For compensatory damages in an amount to be determined at trial;

2.      For punitive damages in an amount to be determined at trial;

3.      For an award of pre-judgment and post-judgment interest;

4.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.      For such other and further relief as the Court may deem proper.

## On the Third Cause of Action

1.      For compensatory damages in an amount to be determined at trial;

2.      For punitive damages in an amount to be determined at trial;

3.      For an award of pre-judgment and post-judgment interest;

4.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.      For such other and further relief as the Court may deem proper.

## On the Fourth Cause of Action

1.      For a declaration (a) that Defendant's cost of insurance rate increase is improper under the Plaintiff Policies and that the policies' account values be recalculated according to the original cost of insurance rates; and (b) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the cost of insurance rates;

2.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3.      For such other and further relief as the Court may deem proper.

Dated: August 16, 2018

Jeffrey R. Lerman (#19388)
Richard G. Placey (#37713)
Montgomery, McCracken,
  Walker & Rhoads, LLP
123 South Broad Street, 24th Fl.
Philadelphia, PA 19109
Phone:  215-772-1500
jlerman@mmwr.com
rplacey@mmwr.com

Khai LeQuang (*pro hac vice*)
Ric Fukushima (*pro hac vice*)
Orrick Herrington & Sutcliffe LLP
2050 Main St., Suite 1100
Irvine, CA 92614
Phone: 949-567-6700
klequang@orrick.com
alloyd@orrick.com

Geoffrey G. Moss (*pro hac vice*)
Orrick Herrington & Sutcliffe LLP
777 S. Figueroa St., Suite 3200
Los Angeles, CA 90017
Phone: 213-629-2020
gmoss@orrick.com

*Attorneys for Plaintiffs, EFG Bank AG, Cayman
Branch; Wells Fargo Bank, National
Association, as securities intermediary for EFG
Bank AG, Cayman Branch; DLP Master Trust;
DLP Master Trust II; GWG DLP Master Trust;
Greenwich Settlements Master Trust; and Palm
Beach Settlement Company*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: August 16, 2018

Jeffrey R. Lerman (#19388)
Richard G. Placey (#37713)
Montgomery, McCracken,
  Walker & Rhoads, LLP
123 South Broad Street, 24th Fl.
Philadelphia, PA 19109
Phone:  215-772-1500
jlerman@mmwr.com
rplacey@mmwr.com

Khai LeQuang (*pro hac vice*)
Ric Fukushima (*pro hac vice*)
Orrick Herrington & Sutcliffe LLP
2050 Main St., Suite 1100
Irvine, CA 92614
Phone: 949-567-6700
klequang@orrick.com
alloyd@orrick.com

Geoffrey G. Moss (*pro hac vice*)
Orrick Herrington & Sutcliffe LLP
777 S. Figueroa St., Suite 3200
Los Angeles, CA 90017
Phone: 213-629-2020
gmoss@orrick.com

*Attorneys for Plaintiffs, EFG Bank AG, Cayman Branch; Wells Fargo Bank, National Association, as securities intermediary for EFG Bank AG, Cayman Branch; DLP Master Trust; DLP Master Trust II; GWG DLP Master Trust; Greenwich Settlements Master Trust; and Palm Beach Settlement Company*